# In the United States Court of Federal Claims

No. 06-786C

(Filed Under Seal: March 28, 2007)
(Reissued: April 3, 2007)

_____

| | |
|---|---|
| **KNOWLEDGE CONNECTIONS TRAVEL, INC.** | ) Pre-award bid protest converted to a |
| | ) post-award protest; cross-motions for |
| | ) judgment on the administrative record; |
| | ) General Services Administration set- |
| Plaintiff, | ) aside contracts for service-disabled, |
| | ) veteran-owned small businesses; |
| v. | ) information technology procurement; |
| | ) Veterans Technology Services |
| **UNITED STATES,** | ) Government-wide Acquisition Contract; |
| | ) "executive agent" designation by the |
| Defendant, and | ) Office of Management and Budget |
| | ) |
| **CATAPULT TECHNOLOGY, LTD.,** | ) |
| | ) |
| Intervening Defendant. | ) |
_____ )

Bryant S. Banes, Neel, Hooper & Banes, PC, Houston, TX, for plaintiff.

Allison Kidd-Miller, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Adele R. Vine, Acting Regional Counsel, General Services Administration, Kansas City, MO.

John E. McCarthy, Jr., Crowell & Moring, LLP, Washington, D.C., for intervening defendant.  With him on the briefs was Thomas P. Humphrey, Crowell & Moring, LLP, Washington, D.C.

**OPINION AND ORDER**[1]

_____

[1]Because this opinion and order might have contained "confidential or proprietary information" within the meaning of Rules of the Court of Federal Claims ("RCFC") Appendix C,

LETTOW, Judge.

Plaintiff Knowledge Connections Travel, Inc. ("KCI") lodged this bid protest involving an information-technology set-aside procurement for service-disabled, veteran-owned small businesses.  The General Services Administration ("GSA") administered the procurement, known as the Veterans Technology Services Government-wide Acquisition Contract ("VETS GWAC"), under an "executive agent" designation bestowed on GSA by the Office of Management and Budget ("OMB"), the overseer of all federal procurement of information technology.  VETS GWAC was part of an effort to implement Executive Order 13360, by which Order the President sought to effectuate two federal statutes that (1) set a government-wide goal of not less than three percent for the participation in federal procurement contracts of small businesses owned and controlled by service-disabled veterans and (2) permit certain set-aside and restricted-competition procurements for service-disabled, veteran-owned businesses.  *See* Exec. Order No. 13360, 69 Fed. Reg. 62,549, 62,549 (Oct. 26, 2004); *see also* 15 U.S.C. §§ 644(g)(1), 657f.  Conceptually, by way of the VETS GWAC, GSA endeavored to select a pool of pre-qualified, service-disabled, veteran-owned small businesses that then would compete for information technology "task orders" from individual agencies across the federal government.

KCI filed its complaint on November 22, 2006, amending it on November 29, 2006.  KCI initially claimed a variety of errors in the procurement process, Am. Compl. ¶¶ 15-23, but it ultimately focused on its allegations that GSA (1) arbitrarily limited the number of awardees, (2) violated a condition of OMB's "executive agent" designation that prohibited GSA from taking into account an offeror's lack of government contracting experience, and (3) arbitrarily employed a tiering arrangement for evaluation of past experience based on monetary values of previous contracts offerors had performed, thus in effect excluding from consideration for an award KCI and others who did not have a broad range of prior work.  Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Mot.") at 7; Pl.'s Resp. to Def.'s Supplemental Brief at 1-2.  On November 29, 2006, Catapult Technology, Ltd., an offeror identified at the time as a potential awardee, was granted leave to intervene in this matter.

Following a status conference on November 29, 2006, the court adopted an expedited schedule for submitting the administrative record and for filing cross-motions for judgment on the administrative record.  By a motion filed December 15, 2006, KCI sought a temporary restraining order to preclude GSA from completing the VETS GWAC by awarding contracts, until this court ruled on KCI's pending request for a permanent injunction.  On that same day, the court held a hearing on that motion and denied it.  Promptly thereafter, on December 18, 2006, GSA awarded contracts to 43 service-disabled, veteran-owned small businesses, including

¶ 4, it was initially filed under seal and the parties were requested to submit proposed redactions.  After receipt and consideration of the proposals, the decision was redacted for publication.  The resulting redactions are shown by brackets enclosing asterisks as follows: "[***]."

intervenor,[2] and this action was then converted from a pre-award bid protest to a post-award protest.  Subsequently, on January 8, 2007, the parties filed a stipulation that "[p]laintiff will not pursue any injunctive or declaratory relief from this [c]ourt in this . . . action that will have the effect of invalidating any award made by GSA on December 18, 2006, as part of the VETS GWAC procurement, to any of the 43 awardees, including [i]ntervenor."  Stipulation ¶ 1.[3] Following briefing, a hearing on the cross-motions for judgment on the administrative record and on separate motions filed by each party seeking to supplement the administrative record was held on January 26, 2007.  Supplemental briefing was concluded on February 21, 2007.  The case is now ready for disposition.[4]  For the reasons set forth below, the court remands this case to GSA for a determination of whether the tiering arrangement included in the solicitation is consistent with Executive Order 13360 and the conditions OMB placed on the "executive agent" designation it bestowed on GSA.

## FACTS[5]

### A.  Statutory Background

In 1999, Congress amended Section 15(g)(1) of the Small Business Act to require the President to establish a government-wide goal of not less than three percent for the participation in federal procurement contracts of small businesses owned and controlled by service-disabled veterans.  *See* Veterans Entrepreneurship and Small Business Development Act of 1999 (the "1999 Act"), Pub. L. No. 106-50, § 502(a)(2), 113 Stat. 233, 247 (codified at 15 U.S.C. § 644(g)(1)).  In responding to public comments on proposed amendments to the Federal Acquisition Regulation ("FAR") pursuant to the 1999 Act, the Civilian Agency Acquisition

---

[2]*See* GSA, List of VETS Contract Holders (Mar. 15, 2007), http://www.gsa.gov/Portal/ gsa/ep/contentView.do?noc=T&contentType=GSA_BASIC&contentId=22226 ("Awardee List")."

[3]KCI originally sought (1) a ruling that GSA acted improperly by violating applicable procurement statutes and regulations in a way that materially prejudiced KCI, (2) an order directing GSA to disqualify all awardees under the VETS GWAC contract and to terminate any existing contracts with them; (3) an injunction preventing GSA from awarding any contracts to the awardees; and (4) an order directing GSA to revise its solicitation and resolicit proposals. Am. Compl. at 12-13.

[4]In this connection, the court has acted under RCFC 65(a)(2) to consolidate two motions for preliminary injunction, filed on November 28, 2006 and December 13, 2006, respectively, with the hearing and resolution of the case on the merits.

[5]The recitations that follow constitute findings of fact by the court drawn either from the administrative record of the procurement or evidentiary submissions by the parties related to prejudice and equitable factors.

Council and the Defense Acquisition Regulations Council ("Councils")[6] specifically rejected a request that the FAR refer to the three percent goal:

> The FAR does not specify the statutory Government[-]wide goals for any small business category because they have no regulatory purpose for agencies.  Statutory goals for small businesses are established on a Government[-]wide basis.  Within these Government[-]wide goals, SBA negotiates separate annual goals for each small business category with each agency. The individual agency goals attempt to reflect the agency mission and its contracting requirements, and these individual agency goals may be higher or lower than the Government[-]wide goal. SBA then tracks cumulative agency achievements against the Government[-]wide goal. Accordingly, specifying the 3 percent service-disabled veteran-owned small business goals in the FAR is inappropriate in that only the goal negotiated with SBA is relevant to that agency.

Federal Acquisition Regulation; Veterans Entrepreneurship and Small Business Development Act of 1999, 66 Fed. Reg. 53,492, 53,492 (Oct. 22, 2001).  A further amendment of the Small Business Act was enacted in 2003, when Congress added Section 36 to give federal agency contracting officers discretion to set aside certain procurements for service-disabled, veteran-owned small businesses through the use of sole-source contracts and contracts in which competition was restricted to such businesses.  *See* Veterans Benefits Act of 2003 ("2003 Act"), Pub. L. No. 108-183, § 308, 117 Stat. 2651, 2662 (codified at 15 U.S.C. § 657f).  In issuing a final rule amending the FAR to include regulations for the sole-source and set-aside provisions of the 2003 Act, the Councils rejected a public comment that requested altering the language from "may set-aside" to "shall set aside."  *See* Federal Acquisition Regulation; Procurement Program for Service-Disabled Veteran-Owned Small Business Concerns, 70 Fed. Reg. 14,950, 14,953 (March 23, 2005); 48 C.F.R. § 19.1405(a) (2004).  The Councils explained that by using the words "may award" the Veterans Benefits Act of 2003 "established a discretionary, not mandatory, set-aside authority for [service-disabled, veteran-owned small businesses]."  70 Fed. Reg. at 14,953; *see* 15 U.S.C. § 657f(a) ("contracting officer may award a sole source contract"); 15 U.S.C. § 657f(b) ("contract officer may award contracts on the basis of competition restricted to small businesses owned and controlled by service-disabled veterans"); 48 C.F.R. §§ 19.1405(a) ("may set aside acquisitions"), 19.1406(a) ("may award contracts").

---

[6]The FAR is "prepared, issued, and maintained" jointly by the Secretary of Defense, the Administrator of General Services, and the Administrator of the National Aeronautics and Space Administration.  48 C.F.R. § 1.103(b) (2006).  The Civilian Agency Acquisition Council, chaired by GSA, and the Defense Acquisition Regulations Council are charged with revising the FAR. *See* 48 C.F.R. § 1.201-1(b), (c), (d) (2006).

## B.  Executive Order 13360 and OMB's "Executive Agent" Authority

On October 20, 2004, President Bush issued Executive Order 13360, the objective of which was to accomplish "more effective[] implement[ation]" of Sections 15(g) and 36 of the Small Business Act, *i.e.*, 15 U.S.C. §§ 644(g)(1), 657(f).  69 Fed. Reg. at 62,549.  The Executive Order required that agency heads develop a strategy for implementation of these statutory provisions and specifically directed the Administrator of GSA, subject to applicable legal and fiscal constraints, to "establish a Government-wide Acquisition Contract [GWAC] reserved for participation by service-disabled veteran businesses."  *Id.* at 62,550.

In February 2005, responding to the president's direction, GSA sent OMB a proposal to establish the VETS GWAC, which GSA described as a "streamlined acquisition vehicle" through which GSA would "offer a pre-qualified group of [service-disabled, veteran-owned small business] information technology firms the opportunity to compete for government [information technology] services orders from [government agencies]."  AR 18-19 (GSA, VETS (Veterans Technology Services) Business Case For a Service-Disabled Veteran-Owned Small Business (SDVOSB) Government-wide Acquisition Contract (GWAC), Feb. 3, 2005) ("Business Case").[7]  GSA indicated that "[e]valuation criteria [would], at a minimum, focus on technical expertise, successful past performance and price" and also highlighted the flexibility that the VETS GWAC would afford governmental agencies ("clients"):

> The VETS contract will permit a wide range of order types inclusive of fixed price (all in the fixed price family), labor hour and time and material.  This flexibility allows clients to select contract types commensurate with specific technical requirements and risk factors as well as the tools to incentivize schedule, price and or quality objectives when utilizing performance-based contracting techniques.

AR 18, 21, 32 (Business Case).[8]

OMB, which is charged with overseeing the federal government's acquisition of information technology, reviewed GSA's Business Case and granted GSA the designation of

---

[7]"AR __" refers to the administrative record filed with the court in accord with RCFC 52.1(a).  On December 20, 2006, the government filed a motion to supplement the administrative record, and the court granted that motion on December 22, 2006.  A second motion by the government for leave to supplement the administrative record and to file the record on CD-ROM, filed January 12, 2007, is being granted in conjunction with this opinion and order.

[8]GSA also stressed the importance of effectively marketing the VETS GWAC, should it be approved.  A survey of government procurement professionals had revealed that a barrier to the fulfillment of the three percent goal of 15 U.S.C. § 644(g)(1) was simply identifying service-disabled, veteran-owned small businesses.  AR 29-30, 33 (Business Case).

"executive agent" for the VETS GWAC.  AR 85 (Letter from Joshua B. Bolten, Director, OMB, to Stephen A. Perry, Administrator, GSA (July 5, 2005)).[9]  OMB described the VETS GWAC as a procurement that would "[o]ffer[] agencies access to competitive firms offering [information technology] services" and determined that the VETS GWAC "would fulfill GSA's responsibilities under Executive Order 13360."  AR 89, 92 (Letter from Bolten to Perry, Encls. A, B (July 5, 2005)).  OMB also included caveats for its designation of GSA as the "executive agent" for the VETS GWAC: "This designation is granted with the expectation that contracts under this GWAC will be awarded to the most highly qualified service-disabled veteran-owned small businesses.  Potential contractors should not be excluded from being GWAC holders based on their lack of experience as a government contractor."  AR 93 (Letter from Bolten to Perry, Encl. B (July 5, 2005)).  In August 2006, OMB extended the "executive agent" designation until the completion of the VETS GWAC contract period.  AR 96, 99 (Letter from Rob Portman, Director, OMB, to Lurita A. Doan, Administrator, GSA (Aug. 9, 2006)).

## C.  GSA's Procurement Actions

Prior to receiving the "executive agent" designation, GSA posted a pre-solicitation notice on the government's on-line procurement portal in February 2005, AR 144, and hosted a pre-solicitation conference in March 2005 to explain the VETS GWAC to potential vendors.  AR 51-63 (Veterans Technology Services (VETS) GWAC Powerpoint Presentation, Pre-Solicitation Conference (Mar. 22, 2005)) ("VETS GWAC Powerpoint Presentation").  A presentation by representatives of GSA delivered during the conference explained that the VETS GWAC would involve "competitive contract awards" to an undetermined number of awardees.  AR 59 (VETS GWAC Powerpoint Presentation).

On March 31, 2005, GSA issued VETS GWAC under Solicitation 6FG2005MTV00001, and it amended the solicitation on seven occasions through July 2005.  AR 144-45.[10]  GSA described the VETS GWAC as a multiple-award indefinite delivery, indefinite quantity contract limited to service-disabled, veteran-owned vendors and designed to provide "a wide range of information technology support services, while providing the greatest amount of flexibility possible to efficiently and effectively support agency daily operations, protection of

---

[9]By statute, OMB directs and oversees the federal government's "acquisition and use of information technology," and federal agencies are required to comply with the associated policies promulgated by OMB.  44 U.S.C. §§ 3504(a)(1)(B)(vi), 3506(a)(1)(B).  In this role, OMB has authority to designate heads of executive agencies as "executive agent[s] for Government-wide acquisitions of information technology."  40 U.S.C. § 11302(e).  In turn, heads of executive agencies have authority to enter into "contract[s] that provide[] for multiagency acquisitions of information technology in accordance with guidance issued by [OMB]."  40 U.S.C. § 11314(a)(2).

[10]The solicitation closed on July, 15, 2007.  AR 143 (Frequently Asked Questions, Question 31).

6

infrastructure, the fight against terrorism, and the development and marketing of information technologies." AR 178 (Solicitation §§ C.2).[11]  As the "executive agent" for the VETS GWAC, GSA was charged with selecting a pool of eligible awardees who would then compete for task orders issued by individual federal agencies.  AR 18 (Business Case), 151, 178, 994 (Solicitation §§ B.1, C.1, C.4).  The solicitation indicated that GSA anticipated awarding 20 contracts in each of two separate and distinct functional areas: Functional Area 1 (Systems Operations and Maintenance) and Functional Area 2 (Information Systems Engineering).  AR 182-83, 263 (Solicitation §§ C.11.1-C.11.2, L.9).[12]  The VETS GWAC proposed a base period of five years and one additional five-year optional period.  AR 151 (Solicitation § B.1).  Although awardees were guaranteed task orders of at least $2,500, the solicitation warned that "GSA [did] not have projects designated/earmarked for this Contract program and they are not guaranteed to be forthcoming."  AR 151-52 (Solicitation §§ B.2-B.3).

GSA first eliminated offers that were incomplete, did not adhere to the solicitation instructions, or included unreasonable pricing.  AR 266 (Solicitation §§ M.2-M.3).  For offers passing these rudimentary tests, GSA then conducted a trade-off process based on (1) non-price technical merit and (2) price.  AR 266 (Solicitation §§ M.3-M.4).  GSA evaluated technical merit on the basis of "examples of past performance" by the offerors, plus each offeror's "contract performance plan."  *Id.*  (Solicitation § M.4).  GSA graded an offeror's past performance on a pass-fail basis[13] by reviewing a Dun & Bradstreet evaluation of the offeror's performance of at least six contracts within three years of the original deadline for receipt of offers, June 3, 2005.  AR 150 (Solicitation § A), AR 1006-07 (Solicitation § L.2.d.).[14]  Each offeror's submitted "contract performance plan" was to explain (1) how the offeror could perform the breadth of the work in each of the numerous listed "work-scope elements" associated with the Functional Area

---

[11]In a set of "Frequently Asked Questions" posted online with the solicitation, GSA was asked "Why is the evaluation methodology so rigorous?" It responded that "[i]t was necessary to establish substantive evaluation criteria to manage the high number of anticipated proposals, to ensure awards were made to offerors well qualified to perform the breadth of the work and to enable us to identify the most highly capable responsible offerors."  AR 142 (Frequently Asked Questions, Question 29).

[12]In a set of "Frequently Asked Questions" posted on-line with the solicitation, GSA indicated that there was "no predetermined number of awards."  AR 137  (Frequently Asked Questions, Question 5).

[13]If an offeror failed the "past experience" element, the contracting officer was required to refer the offeror to the Small Business Administration "for review and possible issuance of a Certificate of Competency."  AR 266 (Solicitation § M.4.a.).

[14]The solicitation required offerors to obtain from Open Ratings, a "strategic partner with [Dun & Bradstreet]," a Past Contractual Performance Evaluation Report and include that report in the proposal submitted to GSA.  AR 1006 (Solicitation § L.2.d).

for which the offeror was bidding ("CPP1"), (2) the offeror's depth of experience in each of those "work scope elements" ("CPP2"), and (3) how the offeror could properly manage the limitations on subcontracting requirements ("CPP3").  AR 1008-11 (Solicitation § L.2.e.), 1246 (Executive Summary of VETS GWAC Source Selection (undated)).[15]

Under CPP2, offerors were to provide instances of their work experience within the past three years in each of the work-scope elements.  AR 1009 (Solicitation § L.2.e.).[16]  Offerors could provide a maximum of three qualifying examples for each of three tiers stratified by contract values:

| Monetary Tier | Minimum Completed Work Value | Maximum Completed Work Value |
| --- | --- | --- |
| Tier I | $  25,000.00 | $100,000.00 |
| Tier II | $100,000.01 | $250,000.00 |
| Tier III | $250,000.01 | unlimited |

*Id*.  Thus, an offeror could potentially include up to nine qualifying work experiences for a particular work-scope element.  For Functional Area 1, which had 38 work-scope elements, an offeror could provide up to 342 examples of work experience; for Functional Area 2, which had 26 work-scope elements, a vendor could identify up to 234 examples.  *See id.*; AR 182-84 (Solicitation §§ C.11.1-C.11.2).  Within the constraints of the monetary-tiering arrangement, each experience per monetary tier and per work-scope element was of equal value.[17]

Under the evaluation plan set out in the solicitation, for each Functional Area, GSA would rank all of the acceptable offers from highest to lowest on the basis of non-price technical merit, with the contract performance plan being "significantly more important than price."  AR

---

[15]Work-scope elements were specifically identified subcategories under each of the two Functional Areas.  For example, work-scope elements under Functional Area 1, Systems Operations and Maintenance, included such subcategories as Technical Support and Internet System Architecture and Webmaster Support.  Work-scope elements under Functional Area 2, Information Systems Engineering, included such areas as Software Engineering and Computer Security Awareness and Training.  AR 182-84 (Solicitation §§ C.11.1-C.11.2).

[16]The contract experience must have been within three years of the original deadline for receipt of offers, June 3, 2005.  AR 150 (Solicitation § A), 1009 (Solicitation § L.2.e.).

[17]For example, an offeror's qualifying experience performing under a $25,000 contract (Tier 1) was of equal value to another offeror's qualifying experience performing under a $750,000 contract.  Likewise, an offeror's qualifying experience under a particular work-scope element was worth the same as such experience under another work-scope element.  The tiering arrangement, however, precluded counting an offeror's qualifying experiences in a monetary tier to the extent that those experiences exceeded three.  *See* AR 1009 (Solicitation § L.2.e.).

266, 1014 (Solicitation §§ M.4., M.5., M.6.).  GSA then would begin the technical-price trade-off by making a series of paired comparisons with offers of lower technical rank, but lower price. AR 1014 (Solicitation § M.6.).  An offer with a higher technical score *and* a lower price than another offer would be considered the better value.  AR 1014 (Solicitation § M.6.a.).  If the first offer in a paired comparison was technically superior to a second, but the second offered a lower price, GSA would review the technical merit of the first to determine whether it warranted the higher price.  AR 1014 (Solicitation § M.6.b.).  The paired comparisons would continue until all of the offers had been evaluated for best value.  AR 1015 (Solicitation § M.6.c.).  GSA retained the discretion to determine the final number of awards by identifying for each Functional Area where a "natural break[]" occurred between a particular offer and remaining offers of lesser overall merit.  *See* AR 1015 (Solicitation § M.6.c.).

In the evaluation GSA actually conducted, it employed a "natural break" for the VETS GWAC, explaining that it continued the paired comparisons until reaching the point where "the remaining proposals offer[ed] significantly decreased technical capabilities" not warranting a continuation of the trade-off process.  AR 2114 (Trade-off Analysis Documentation, Functional Area 1), 2716 (Trade-off Analysis Documentation, Functional Area 2); *see also* Def.'s Mot. for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 9.

On June 28, 2005, KCI submitted a proposal for Functional Area 1 and another for Functional Area 2.  AR 1042-1141 (KCI's Proposal, Functional Area 1), 1143-1244 (KCI's Proposal, Functional Area 2).  KCI's offers expired on June 29, 2006.  AR 2800-02 (Memo from Matt T. Verhulst, Contracting Officer, GSA (Nov. 3, 2003)).  On June 7, 2006, GSA e-mailed all offerors that had not been eliminated from the VETS GWAC competition to request that they extend the acceptance period for their offers to October 2, 2006, due to delays caused by two pending bid protests filed with the Government Accountability Office ("GAO").  AR 2803-05 (E-mail from Janna Babcock, Contracting Officer, GSA, to Offerors (June 2, 2006)), 2806-08 (E-mail from Babcock to Offerors (June 7, 2006)).  KCI responded by submitting its extension to GSA via facsimile.  AR 2809 (E-mail from Marion Bonhomme-Knox, KCI's president and chief executive officer, to Summer Scullin (June 7, 2006); Pl.'s Mot. Ex. 2 (Declaration of Bonhomme-Knox), Encl. 1 (E-mail from Scullin, KCI, to Babcock (June 8, 2006)).[18]  The document KCI submitted was actually a copy of an e-mail from Ms. Bonhomme-Knox to a KCI employee and included (1) the original e-mail from GSA, (2) Ms. Bonhomme-Knox's purported signature and a checked box affirming that Ms. Bonhomme-Knox "agree[d] to the new offer acceptance date," and (3) a forwarded e-mail from Ms. Bonhomme-Knox to the employee indicating that KCI "need[ed] to go to [its] subcontractors to request that they extend [their offers] also."  AR 2809 (E-mail from Bonhomme-Knox to Scullin (June 7, 2006)); AR 2800 (Memo from Verhulst (Nov. 3, 2003)).

---

[18]KCI avers that it also sent a copy of the offer extension via electronic mail.  *See* Pl.'s Emergency Mot. for a Preliminary Injunction (Dec. 15, 2006) at 3.

KCI received [***] for CPP1 and CPP3 in both Functional Areas, but for CPP2, KCI received only [***] out of 342 points [***] percent) in Functional Area 1 and [***] out of 234 points [***] percent) in Functional Area 2. AR 17172, 17176-80, 17182, 17186-89 (GSA Evaluation of KCI's Proposals in Functional Areas 1 and 2); *see also* AR 1251 (Executive Summary of VETS GWAC Source Selection (undated)) (explaining grading of CPP3).

After evaluating 148 proposals for Functional Area 1 and 126 proposals for Functional Area 2, AR 1329 (Trade-off Analysis Documentation, Functional Area 1), 2115 (Trade-off Analysis Documentation, Functional Area 2), GSA selected 43 potential awardees for Functional Area 1 and 36 potential awardees for Functional Area 2. AR 2114 (Trade-off Analysis Documentation, Functional Area 1), 2716 (Trade-off Analysis Documentation, Functional Area 2). The 79 potential awards for both functional areas were projected to go to 45 vendors. AR 2717-22 (Letter from Babcock to Offerors (Aug. 25, 2006)). By letter of August 25, 2006, GSA provided offerors a list of the "apparently successful offerors," which list did not include KCI. *Id.*[19]

### D.  Prior Procedural History

On September 5, 2006, KCI filed a formal challenge with GSA to the small-business size and service-disabled, veteran-owned status of each of the 45 companies that were named as potential awardees.[20] AR 17004-12 (E-mail from Bryant S. Banes, Counsel to KCI, to Babcock). GSA referred the challenge to the Small Business Administration ("SBA"), and by a series of decisions issued from September 12, 2006 to December 7, 2006, the SBA ultimately dismissed KCI's challenges to the small-business size and service-disabled, veteran-owned status of each of the 45 entities. AR 17039-40, 17066-75, 17095-101, 17103-04, 17106-07, 17124-43, 17158-61 (Various letters from the SBA to KCI rejecting KCI's challenges).

---

[19]After GSA identified the "apparently successful offerors," the agency made a second request on September 14, 2006 that offerors extend their offers through December 26, 2006, and KCI agreed to the extension. AR 2810-13 (E-mail from Babcock to Offerors (Sept. 14, 2006)); AR 2814 (E-mail from Susan M. Wood, KCI (Sept. 18, 2006)).

   KCI also responded to a third GSA request to extend offers, sent on December 5, 2006, but GSA rejected that offer extension, explaining that the request had been mistakenly sent to KCI and that KCI already had been removed from the competition because its first offer extension had been defective. AR 3436 (E-mail from Babcock to Scullin (Dec. 8, 2006)); AR 3437-38 (E-mail from Babcock to Offerors (Dec. 5, 2006)); *see infra*, at 12 (explaining GSA's rationale for determining that KCI's first offer extension had been defective).

[20]Federal government agencies do not themselves formally verify whether an offeror is legitimately a service-disabled, veteran-owned small business. Rather, any interested party may protest an apparently successful offeror's status before the Small Business Administration. *See* 13 C.F.R. §§ 125.24, 125.25.

On September 8, 2006, KCI filed a bid protest before GAO, alleging that GSA had arbitrarily limited the number of potential awardees to 45, deviated from the stated evaluation criteria and from applicable statutes and regulations, and improperly denied KCI's request for a pre-award debriefing. AR 16780-83 (Letter from Banes to General Counsel, GAO (Sept. 8, 2006)). On October 3, 2006, GAO dismissed the portion of KCI's protest regarding the number of potential awardees, noting that the Solicitation had specifically stated that "[a]pproximately 20 awards are anticipated in each Functional Area." AR 16829-30 (Fax from Ralph O. White, Deputy Assistant Gen. Counsel, GAO, to Banes and Adele Ross Vine, GSA (Oct. 3, 2006)) (quoting AR 263 (Solicitation § L.9)).

Several weeks later, on October 17, 2006, KCI filed a supplemental protest, alleging other errors in GSA's consideration of KCI's proposals. AR 16870-72 (Letter from Banes to White (Oct. 17, 2006)). On November 3, 2006, in the midst of that GAO protest, GSA asserted for the first time that KCI had failed in its submission of June 8, 2006 properly to extend its offers because Ms. Bonhomme-Knox's signature was not "an original signature," but rather a "stamp imprint," and KCI's offer extension had "contained a qualification that the subcontractors needed to" confirm their offers. AR 2800 (Memo from Verhulst (Nov. 3, 2003)). On these grounds, GSA concluded that KCI's offer had expired on June 30, 2006 and that KCI could not be an interested party to the bid protest. *Id.*[21] KCI filed yet a second supplemental protest with GAO on November 3, 2006, charging additional errors in the procurement process. AR 16888-90 (Letter from Banes to White (Nov. 3, 2006)). On November 22, 2006, the day KCI filed suit in this court, GAO dismissed KCI's bid protests pursuant to 4 C.F.R. § 21.11(b) (2006). AR 17000 (Facsimile transmission from Gary L. Kepplinger, Gen. Counsel, GAO, to KCI (Nov. 22, 2006)) (dismissal "where the matter involved [becomes] the subject of litigation before a court of competent jurisdiction").

### Jurisdiction

A plaintiff in a bid protest bears the burden of establishing by a preponderance of the evidence that this court has subject matter jurisdiction over his or her claims. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In determining whether subject matter jurisdiction exists, a court must accept as true all undisputed factual assertions in the plaintiff's complaint and "draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Although KCI's complaint was initially a pre-award bid protest, Am. Compl. ¶ 4 (noting GSA's letter of August 25, 2006 identifying the "apparently successful offerors"); AR 2717-22 (Letter from Babcock to Offerors (Aug. 25, 2006)), following the awarding of VETS GWAC contracts on December 18, 2006, KCI's complaint was transformed into a post-award bid protest.

---

[21]This conclusion was inconsistent with a GSA contracting officer's "memo to file" that recited that only two firms, neither of which was KCI, had not properly extended their acceptance period for their offers. AR 2736 (Memo to File, 6FG2005MTV00001 VETS GWAC, from Babcock (dated Oct. 12, 2006 in a handwritten annotation)).

The government contends that KCI does not have standing – and thus that this court has no jurisdiction over KCI's claims – because KCI failed properly to extend its offers.  Def.'s Cross-Mot. at 16.  Because KCI's extension of its offers included the text of an e-mail from Ms. Bonhomme-Knox to a KCI employee noting that KCI "need[ed] to go to [its] subcontractors to request that they extend [their offers] also," AR 2809 (E-mail from Bonhomme-Knox to Scullin (June 7, 2006)); AR 2800 (Memo from Verhulst (Nov. 3, 2003)), the government contends that KCI's extension of its offers was conditional and therefore defective.  Def.'s Cross-Mot. at 16-18.  The government further argues that the extension was ineffective because it did not contain a "bona-fide signature" as required by Section L.2.a. of the solicitation.  *Id.* at 19-20.  KCI responds that the offer extension was actually not conditional and that Ms. Bonhomme-Knox's signature was an original signature.  Pl.'s Mot. at 11.

As part of the jurisdictional inquiry, a court must determine whether the protester has standing to sue.  *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  This bid protest case falls squarely within the scope of 28 U.S.C. § 1491(b)(1):

> [T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. [The court] shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.[22]

Both of the government's challenges to KCI's standing are unavailing.  Notably, GSA launched both challenges – to the alleged conditional-offer extension and to Ms. Bonhomme-Knox's signature – only after KCI filed its bid protest with the GAO and nearly five months after KCI transmitted its original offer extension to GSA.  *See* AR 16780-83 (Letter from Banes to

---

[22]Under this portion of the Tucker Act, the court possesses jurisdiction over both the pre- and post-award bid protests of "interested part[ies]."  *See American Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1299-1300 (Fed. Cir. 2001); *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999); *Park Tower Mgmt., Ltd. v. United States*, 67 Fed. Cl. 548, 557-59 (2005) (quoting 28 U.S.C. § 1491(b)(1)).  Interpreting the term "interested party" to have the same meaning as that term is given in the Competition in Contracting Act, 31 U.S.C. § 3551, the Federal Circuit has concluded that an interested party in a bid protest is any "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'"  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004)   (quoting *American Fed'n of Gov't Employees*, 258 F.3d at 1302).  "The term 'interested party,' with respect to a contract or a solicitation or other request for offers . . . , means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  31 U.S.C. § 3551(2)(A).

GAO (Sept. 8, 2006)); AR 2800 (Memo from Verhulst (Nov. 3, 2006)).  Moreover, GSA's challenge came after it had already approved KCI's second offer extension and apparently – according to a file memorandum last updated in mid-October 2006 – after GSA's contracting officer had concluded that only two firms, neither of which was KCI, had not properly extended their offers.  AR 2810-13 (E-mail from Babcock to Offerors (Sept. 14, 2006)); AR 2814 (E-mail from Wood (Sept. 18, 2006)); AR 2736 (Memo to File from Babcock (dated Oct. 12, 2006 in a handwritten annotation)).  That GSA raised its objections to KCI's extension at such a late stage suggests that GSA's actions were *post hoc* actions designed to forestall KCI's bid protest, not a contemporaneous objective determination by the contracting officer.  *See Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 768-69 (Fed. Cl. 2006); *see also Parker v. Office of Pers. Mgmt.*, 974 F.2d 164, 166-68 (Fed. Cir. 1992).

Even putting aside the belated nature of GSA's challenges to KCI's original offer extension, KCI must prevail on this issue.  Although the e-mail forwarded to GSA began with Ms. Bonhomme-Knox's direction to her employee that KCI should have its subcontractors extend their offers, too, that suggestion was directed to the employee, not to GSA.  AR 2809 (E-mail from Bonhomme-Knox to Scullin (June 7, 2006)); Pl.'s Mot. Ex. 2 (Decl. of Bonhomme-Knox) ¶ 5, Encl. 1 (E-mail from Scullin to Babcock (June 8, 2006)).[23]  In short, the statement

---

[23]Over the government's objection, *see* Def.'s Cross-Mot. at 47-48, the court will permit supplementation of the administrative record to include the sworn declaration of Ms. Bonhomme-Knox, filed with KCI's motion for judgment on the administrative record.  Although the "focal point for judicial review [of an agency's decision] should be the administrative record already in existence, not some new record made initially in the reviewing court," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)), here the material sought to be added to the record relates to the threshold jurisdictional issue of whether KCI has standing.  *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as they exist."); *Cedars-Sinai Med. Center v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) ("In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."); *see also Rodriguez v. United States*, 69 Fed. Cl. 487, 492 n.6 (2006); *Ware v. United States*, 57 Fed. Cl. 782, 783 n.1 (2003).

In KCI's motion for judgment on the administrative record, its reply, and its motion for leave to supplement the administrative record, filed January 24, 2007, KCI seeks supplementation of the administrative record in several additional respects.  First, in its motion for judgment on the administrative record, KCI seeks to supplement the record with various communications between KCI and GSA, letters of commitment from KCI's subcontractors under its bids for the VETS GWAC, and a posting on GSA's internet portal announcing the request for proposals for the VETS GWAC.  Pl.'s Mot. Ex. 2, Encls. 1, 3-4, 6-7.  Over the government's objection, Def.'s Cross-Mot. at 47, the court grants leave to supplement the record with these documents.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1339 (Fed. Cir. 2001).  Second, KCI requests leave to add to the record an OMB memorandum dated December

was an internal KCI communication and not a condition on KCI's agreement to extend its offer to October 2, 2006.  *See* AR 2803-05 (E-mail from Babcock to Offerors (June 2, 2006)), 2806-08 (E-mail from Babcock to Offerors (June 7, 2006)); *see also* AR 2736 (Memo to File from Babcock (dated Oct. 12, 2006 in a handwritten annotation)) (not including KCI among the offerors who had improperly extended their offers).  Because KCI's subcontractors' letters of commitment did not actually contain expiration dates, no extension of their commitments was necessary for KCI to agree to extend its offers.  *See* Pl.'s Mot. Ex. 2, Encl. 3 (Subcontractors' Letters of Commitment).

As to the signature on KCI's offer extension, Ms. Bonhomme-Knox states in a sworn declaration that she believes that she did sign the offer extension and further explains that she suffers from peripheral neuropathy, a condition that affects the consistency of her signatures and that supports her status as a service-disabled veteran.  Pl.'s Mot. Ex. 2 (Decl. of Bonhomme-Knox) ¶ 4.  Moreover, 48 C.F.R. § 14.405 requires that "[t]he contracting officer either . . . give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the Government."  48 C.F.R. § 14.405 (2005).  Among the examples of "minor informalities or irregularities" that the regulation cites is an unsigned bid, if that bid "is accompanied by other material indicating the bidder's intention to be bound by the unsigned bid."  48 C.F.R. § 14.405(c)(1).  Given that GSA claimed, in effect, that KCI's offer extension was unsigned, this provision of the FAR would apply, and it required GSA to have given KCI an opportunity to cure the alleged deficiency.  By faxing the offer extension and checking the box affirming that KCI "agree[d] to the new offer acceptance date," KCI provided an offer extension that was "accompanied by other material indicating [its] intention to be bound" by the offer extension.  *See* AR 2809 (E-mail from Bonhomme-Knox to Scullin (June 7, 2006)); 48 C.F.R. § 14.405(c)(1).

Based on these substantive conclusions and the fact that the government's objections to KCI's standing constitute a *post hoc* response to KCI's bid protests, the court finds that KCI has demonstrated that it is an "interested party" under 28 U.S.C. § 1491(b)(1), thus establishing

---

12, 2004, requesting that federal agencies send to OMB their strategies for implementing Executive Order 13360.  Pl.'s Reply, Ex. A.  Over the government's objection, Def.'s Reply at 16, the court grants leave to supplement the record with this memorandum.  *See Impresa Construzioni*, 238 F.3d at 1339.  Third, KCI seeks leave to supplement the record with a memorandum entitled "Process to Be Used for OMB Approval of New GWAC Business Cases," to which a reference was made in the administrative record, but a copy of which was not included in the record.  *See* Pl.'s Reply at 6.  The court denies this request for supplementation.  The Business Case and OMB's action on the Business Case are part of the administrative record, and those materials are sufficient to delineate OMB's procedures for an executive-agent designation.  Fourth, KCI seeks leave to supplement the administrative record with GSA's post-award debriefing letter to KCI, dated January 19, 2007.  The government does not object to this proposed supplementation if the court otherwise grants leave to supplement the record pursuant to RCFC, App. C, ¶ 22(r), and thus the court grants KCI's motion on that basis.

KCI's standing to bring suit in this bid protest. *See Banknote Corp.*, 365 F.3d at 1352; *Systems Plus*, 69 Fed. Cl. at 768. Therefore, this court has subject-matter jurisdiction to adjudicate KCI's claims in this case.

### Standards for Decision

Under 28 U.S.C. § 1491(b)(4), this court's review of an agency's decision regarding a contractual solicitation or award is governed by the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[24] As specified by the APA, the court must set aside an agency contracting decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review is limited to determining whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). Consistent with these limitations, a court must not "substitute its judgment for that of the agency," *Keeton Corr., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni*, 238 F.3d at 1332 (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). An agency's decision lacks a rational basis if the contracting officer "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corr.*, 59 Fed. Cl. at 755 (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

If a disappointed offeror demonstrates that the government acted without a rational basis or contrary to law in the procurement process, that offeror can prevail in a bid protest upon a further showing that the government's error actually operated to its prejudice in the procurement process. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). Among other things, the protester "must show that there was a 'substantial chance it would have received the contract award but for that error.'" *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed. Cir. 1996)); *see also OTI America, Inc. v. United States*, 73 Fed. Cl. 758, 767 (Fed. Cl. 2006).

---

[24]Section 1491(b)(4) of Title 28 provides: "In any action under [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."

## ANALYSIS

### A. KCI's Motion to Conform its Complaint

At the outset, KCI moves under RCFC 15(b) for leave to conform its complaint to the evidence, *i.e.*, the administrative record. Pl.'s Reply at 2-3. The government opposes this motion, arguing that KCI has not identified with specificity how its pleadings should be amended. Def.'s Reply at 17-19. In the context of this case, KCI's motion turns on both RCFC 15(b), which governs amendment of a pleading to conform to the evidence, and RCFC 52.1(a), which addresses filing the administrative record.

RCFC 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings . . . may be made upon motion of any party at any time . . . but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

In applying the analogous provisions in Fed. R. Civ. P. 15(b), the Federal Circuit observed that the federal rules "are quite permissive in permitting a party to amend its complaint to conform to the evidence and to the positions taken at trial." *Cedars-Sinai*, 11 F.3d at 1582. Here, in the context of a court's consideration of cross-motions for judgment on the administrative record, the "trial" takes place on the administrative record. *See Bannum*, 404 F.3d at 1356 (explaining that "judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record"); *see also Acevedo v. United States*, ___ Fed. Appx. ___, 2007 WL 445004, *1 (Fed. Cir. 2007) (a trial court "is required to make factual findings . . . from the [administrative] record as if it were conducting a trial on the record."); *cf. Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1372 (Fed. Cir. 2006) ("A trial court's decision based upon stipulated facts resembles, in significant respects, a decision on the administrative record."). RCFC 52.1(a) provides that "[i]n all cases in which action by, and a record of proceedings before, an agency is relevant to a decision, the administrative record of such proceedings shall be certified by the agency or agencies and filed with the court." In this instance, the administrative record was filed by the government on December 11, 2006, and was first supplemented on December 22, 2006, several weeks after the complaint and then the amended complaint were filed to commence this action.

In KCI's briefing of its motion for judgment on the administrative record pursuant to RCFC 52.1(b), it makes two claims that were not included in its amended complaint – that the solicitation violated OMB's condition on not excluding offerors based on lack of government contract experience and that CPP2's tiering arrangement violated OMB's further condition that contracts be awarded to the most highly qualified service-disabled, veteran-owned small businesses. *Compare* Am. Compl. ¶¶ 17-18 *with* Pl.'s Reply at 17-18; Pl.'s Resp. to Def.'s Supplemental Br. at 1-2. Both arguments rely on information – GSA's Business Case and OMB's conditions on the grant of the "executive agent" designation – that was not part of the public record of the solicitation and was not available to KCI until the filing of the administrative record.

Given these circumstances, KCI should be granted leave to amend its complaint to include allegations it could not have made prior to examining the administrative record, and the government appears to concede this point. *See* Def.'s Reply at 17-19. The only remaining question is whether KCI was required to make all of its arguments in its initial motion for judgment on the administrative record, a filing that occurred eleven days after the administrative record was filed and on the same day the administrative record was first supplemented by the government. Given that KCI's and the government's filings in this case are all part of the "expedited trial on the record," *see Bannum*, 404 F.3d at 1356, the claims and arguments that KCI put forward in its several briefs will be treated as having been "tried by express or implied consent of the parties." *See* RCFC 15(b); *see also* 6A Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1493 at 24, 28 (2d ed. 1990) ("consent [under Fed. R. Civ. P. 15(b)] generally is found when . . . the party opposing the motion to amend actually produced evidence bearing on the new issue."). In short, the government has failed to "satisfy the court that the admission of such evidence would prejudice the [government] in maintaining [its] action or defense upon the merits," RCFC 15(b), and accordingly, the court grants KCI leave to conform its complaint to the administrative record. *See Bannum*, 404 F.3d at 1356; *Cedars-Sinai*, 11 F.3d at 1582.

## B. Artificial Limit on the Number of Awardees

KCI's first claim in support of its motion for judgment on the administrative record is that GSA artificially limited awards to 43 offerors. Pl.'s Mot. at 7.[25] KCI emphasizes that GSA made no representation in the Business Case presented to OMB that the number of VETS GWAC awards would be limited but that GSA ultimately restricted the awardees to 43. *Id.* at 16-18. The government responds that the number of awards or awardees was not in fact artificially limited. Def.'s Cross-Mot. at 37-38.

_____

[25]KCI actually refers alternatively to 44 offerors, *see* Pl.'s Mot. at 2, 7, but GSA ultimately awarded 74 VETS GWAC contracts – 40 under Functional Area 1, 34 under Functional Area 2 – to 43 offerors. *See* Awardee List.

KCI's argument in this respect is unavailing.  KCI complains that GSA's Business Case "made no mention of any specific limitation on the number of awards" and that, as a result, GSA obtained the "executive agent" designation "under false pretenses."  Pl.'s Mot. at 15-17.  After reviewing the Business Case, however, OMB placed only two restrictions on its grant of the "executive agent" designation: (1) that "the most highly qualified service-disabled veteran owned small businesses" be chosen and (2) that offerors "not be excluded . . . based on their lack of experience as a government contractor."  AR 93 (Letter from Bolten to Perry, Encl. B (July 5, 2005)).  Making a finite number of awards did not violate either OMB condition.

Neither was GSA's decision to award 74 VETS GWAC contracts inconsistent with the solicitation, which explicitly stated that GSA anticipated awarding 20 contracts in both Functional Area 1 and Functional Area 2.  AR 182-83, 263 (Solicitation §§ C.11.1-C.11.2, L.9).  In exceeding by 34 the number of total contracts projected in the solicitation (*i.e.,* 74 contracts, rather than 40), GSA acted consistently with its representation that there was "no predetermined number of awards."  *See* Awardee List; AR 137 (Frequently Asked Questions, Question 5).  As provided in the solicitation, GSA made a series of paired comparisons to evaluate offers' technical merit and price, cutting off the number awardees at a "natural break" where "the remaining proposals offer[ed] significantly decreased technical capabilities" not warranting a continuation of the trade-off process.  AR 1014 (Solicitation § M.6.), 2114 (Trade-off Analysis Documentation, Functional Area 1), 2716 (Trade-off Analysis Documentation, Functional Area 2).  The record thus does not support KCI's claim that GSA artificially limited the number of awards.  Instead, the key questions in this case turn on the criteria GSA used in deciding to make the awards.

### C.  OMB's Requirement that GSA not Exclude Offerors for Lack of Government Contract Experience

KCI also alleges that GSA contravened the conditions on the authority OMB granted the agency under its "executive agent" designation by excluding KCI based on its lack of government contract experience.  Pl.'s Mot. at 7; *see* AR 93 (Letter from Bolten to Perry, Encl. B (July 5, 2005)).  The government denies KCI's allegation, citing the absence of such a restriction in the solicitation and evidence in the administrative record of offerors receiving credit for non-government contract experience.  Def.'s Cross-Mot. at 32-36.

KCI's argument in this regard is also unavailing.  Both parties agree that KCI's scores on CPP2 – in Functional Areas 1 and 2 – were the primary factor leading to its non-selection.  Pl.'s Mot. at 16; Def.'s Cross-Mot. at 36.  Based on this fact, KCI concludes that CPP2, under which GSA evaluated the offeror's depth of experience in each of the identified work-scope elements of a given Functional Area, AR 1009 (Solicitation § L.2.e.), was "purely a measure of 'experience as a government contractor.'"  Pl.'s Mot. at 16.  This claim finds no support in the administrative record.

First, KCI's proposal included its non-governmental (*i.e.,* commercial) experience as a contractor, and GSA credited that experience. *See, e.g.,* AR 1090 (KCI Proposal) (noting experience of KCI's subcontractor in a contract for [***], 1095 (noting experience of KCI's subcontractor in a contract for [***], 1103-04 (noting experience of KCI's subcontractor on two contracts for [***], 1169 (noting experience of KCI's subcontractor on a contract for [***], 1182 (same), 1211 (noting experience of KCI's subcontractor on two contracts for [***], 17177-78 (GSA's providing credit for aforementioned commercial contracting experiences), 17187-88 (same). Second, GSA similarly credited other offerors' commercial contracting experiences. *See, e.g.,* AR 3466 (noting experience of offeror [***] on a contract for [***], 3573 (GSA's providing credit for [***] work for [***], 3602 (noting experience of subcontractor of [***] on a contract for [***], 3715 (GSA's providing credit for this work).

KCI's non-selection was not based on its lack of government contract experience, but rather on its overall lack of breadth of experience as measured under CPP2. KCI was not precluded from citing its experience as a commercial contractor, and KCI and other offerors in fact received credit for such experience. Thus, GSA did not eliminate KCI based on a lack of government contract experience in contravention of OMB's grant of the "executive agent" designation. AR 93 (Letter from Bolten to Perry, Encl. B (July 5, 2005)).

## D. CPP2's Monetary Tiering Evaluation Scheme

KCI also argues that the monetary tiering arrangement of CPP2 violated the conditions on OMB's grant of the "executive agent" designation. Pl.'s Resp. to Def.'s Supplemental Br. at 1-2. KCI alleges that KCI and other offerors were excluded because of a lack of "experience in Tiers 1 and 2," the two lower-monetary-value tiers. *Id.* at 2.

CPP2's monetary tiers as applied to each of the numerous work-scope elements raise questions about whether CPP2's evaluation scheme was consistent with Executive Order 13360 and OMB's "executive agent" designation.[26] Executive Order 13360 declared that agencies "shall more effectively implement" certain statutory provisions that set a government-wide goal of three percent for the participation in federal procurement contracts of service-disabled, veteran-owned small businesses and permitted certain set-aside and restricted-competition procurements for such businesses. 69 Fed. Reg. at 62,549; 15 U.S.C. §§ 644(g)(1), 657f. In seeking to implement the executive order, OMB's grant to GSA of the "executive agent"

---

[26] The solicitation, including the tiering arrangement of CPP2, was initially made public in March 2005, well before both OMB's initial grant to GSA of the "executive agent" designation in July 5, 2005 and OMB's subsequent extension of the designation in August 2006. AR 85 (Letter from Bolten to Perry (July 5, 2005)), 96, 99 (Letter from Portman to Doan (Aug. 9, 2006)); *see also* Def.'s Supplemental Br. at 1-2. GSA could not proceed with the VETS GWAC under the solicitation absent OMB's designation. AR 85 (Letter from Bolten to Perry (July 5, 2005)); *see also* 40 U.S.C. §§ 11302(e), 11314(a)(2). In short, GSA's authority for the solicitation turned on OMB's approval.

designation provided that awardees be "the most highly qualified service-disabled veteran owned small businesses." AR 93 (Letter from Bolten to Perry, Encl. B (July 5, 2005)). As explained *supra* at 7-8, the VETS GWAC solicitation required offerors' proposals to explain under CPP2 the bidder's depth of experience in each work-scope element for a given Functional Area. AR 1009-11 (Solicitation § L.2.e.), 1246 (Executive Summary of VETS GWAC Source Selection (undated)). CPP2 limited offerors to providing three examples of prior contract experience within each of three monetary tiers: $25,000.00 - $100,000.00 (Tier I), $100,000.01 - $250,000.00 (Tier II), and $250,000.01 - unlimited (Tier III). AR 1009 (Solicitation § L.2.e.). Functional Area 1 had 38 work-scope elements, and Functional Area 2 had 26. AR 182-84 (Solicitation §§ C.11.1-C.11.2).

CPP2's tiering arrangement coupled with the numerous work-scope elements operated as a significant constraint on the solicitation. Offerors that could have been "the most highly qualified" in some of the work-scope elements, but not in most or all of them, fared less well then those with broad experience. *See* AR 1009-11 (Solicitation § L.2.e.), 1246 (Executive Summary of VETS GWAC Source Selection (undated)). The breadth of experience CPP2 required suggests that GSA preferred offerors that were a mile wide and an inch deep in terms of experience, such that the awardees were simply "qualified" firms across a broad spectrum of information technology areas, rather than a pool of "the most highly qualified" offerors in a narrower class of work-scope elements, as seemingly contemplated by OMB. In short, GSA ostensibly emphasized breadth of experience at the expense of "the most highly qualified" criterion that OMB mandated. In addition, the breadth of experience required by CPP2's high number of work-scope elements – and the likely resulting reduction in the number of awardees – seems inconsistent with the command of Executive Order 13360 that agencies attempt to meet the government-wide goal of three percent for the participation in federal contracts of service-disabled, veteran-owned small businesses. 69 Fed. Reg. at 62,549; 15 U.S.C. § 644(g)(1).

The limitation to three experiences per tier per work-scope element also posed an impediment to specialized offerors. For example, if an offeror had previously performed ten contracts under a given work-scope element and had received $500,000 for each of these contracts, CPP2 precluded the contractor from receiving credit for seven of those experiences because (1) all ten of the contractor's experiences would fall under Tier 3 and (2) CPP2 limited to three the experiences for which the contractor would receive credit. *See* AR 1009-11 (Solicitation § L.2.e.), 1246 (Executive Summary of VETS GWAC Source Selection (undated)). On the other hand, if a contractor had three experiences in *each* monetary tier under a particular work scope element, the contractor would receive credit for all nine experiences. *See id.*

Certain sections of the solicitation stressed that the VETS GWAC's objective was to provide government agencies with the ability to obtain a broad range of information technology services. *See* AR 152 (Solicitation § B.3) ("requirements may range from simple to highly complex"), 178 (Solicitation § C.2) (VETS GWAC intended "to provide civilian agencies and the Department of Defense (DoD) the ability to obtain a broad range of [c]omprehensive IT support services"), 179 (Solicitation § C.4) ("The anticipated services require a diversity of skills

20

suitable to a multitude of information technology environments in support of a variety of IT support areas."); *see also* AR 142 (Frequently Asked Questions, Question 29) (rigorous evaluation methodology necessary to ensure well-qualified awardees who could perform "the breadth of the work").[27]  The government points to these sections as justification for CPP2's criteria.  Def.'s Supplemental Br. at 1-2.  However, the solicitation does not tie the objective of selecting broadly qualified awardees to the overreaching goal of the VETS GWAC and OMB's executive designation.  The lack of such linkage in the administrative record precludes this court from determining whether CPP2's focus on experience in multiple monetary tiers for each of the numerous work scope elements was consistent with Executive Order 13360 and OMB's "executive agent" designation.

## Remedy

### A. Scope of Relief

On the facts of this case, it would be inappropriate to order a form of relief traditionally employed in bid protest cases, *viz.*, vacating the award of a contract.  The 43 successful awardees in this VETS GWAC arguably are not affected by the apparent inconsistency between GSA's evaluation criteria in CPP2 and Executive Order 13360 and OMB "executive agent" designation.  Moreover, the parties to this case have stipulated that "plaintiff will not pursue any injunctive or declaratory relief from this [c]ourt . . . that will have the effect of invalidating any award made by GSA . . . as part of the VETS GWAC procurement."  Stip. ¶ 1.  As a consequence, the court will assess whether it is appropriate to remand to GSA to reconsider application of the criteria employed in CPP2 to the evaluation of offers made by KCI and others who demonstrated satisfactory past performance in some work-scope elements at some tiers.

Under the Tucker Act, this court possesses "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."  28 U.S.C. § 1491(a)(2); *see also* RCFC 52.2(a)(1) ("on its own motion, the court may in any case within its jurisdiction by order remand appropriate matters to any administrative or executive body or official").  Remand is appropriate if the court cannot render judgment based on the administrative record before it:

[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is

[27]Under the government's theory of the case, the monetary tiers in CPP2 were designed to lead to the selection of awardees that *each* (1) could meet the broad information technology needs of federal agencies as outlined in the solicitation and (2) presumably could perform any of the sort of task orders that GSA envisioned might be issued under the VETS GWAC.  *See* Def.'s Supplemental Br. at 1-2.  Namely, the goal was that *each* awardee would satisfy substantially all objectives of the VETS GWAC.  *See, e.g.,* AR 178 (Solicitation § C.2).

to remand to the agency for additional investigation or explanation.  The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Securities & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained"); *Diversified Maint. Sys., Inc. v. United States,* 74 Fed. Cl. 122, 127 (2006) ("the views expressed in *Florida Power & Light* reflect long-standing administrative practice and precedents").  If the record before the court precludes a determination as to whether "the procurement official's decision lacked a rational basis . . . or . . . the procurement procedure involved a violation of regulation or procedure," *see Impresa Construzioni*, 238 F.3d at 1332, a court's decision to remand the matter to the agency appropriately avoids invading the province of the agency and substituting the court's judgment for that of the agency.  *See Emerald Coast Finest Produce Co. v. United States*, __ Fed. Cl. __, 2007 WL 594923, at *7 (2007); *Diversified Maint. Sys.*, 74 Fed. Cl.  at 126-27.

In this case, the administrative record contains insufficient evidence for the court to determine whether the large number of work-scope elements and the tiering arrangement GSA used in CPP2 to focus on breadth of experience was inconsistent with Executive Order 13360 or OMB's "executive agent" designation.  As the administrative record shows and as the government concedes, GSA's evaluation under CPP2 was critical to its selection of awardees because so many offerors had similar scores in CPP1 and CPP3.  AR 1248 (Executive Summary of VETS GWAC Source Selection (undated)), 2742-49 (Technical Rankings, Functional Areas 1 and 2); Def.'s Reply at 12; Tr. 78:19-25 (Jan. 26, 2007).

### B. Terms of Remand

When remand is appropriate, this court may provide the agency "with such direction as [this court] may deem proper and just."  28 U.S.C. § 1491(a)(2); *see also* RCFC 52.2(a)(1) (same).  RCFC 52.2(a)(2) further provides that "[a]n order of remand shall (A) delineate the area of further consideration or action deemed warranted on the remand, (B) fix the duration of the remand period, not to exceed 6 months, and (C) specify the extent to which court proceedings shall be stayed during the remand period."

This case accordingly is remanded to GSA to determine whether the large number of work-scope elements and the tiering arrangement specified in CPP2 limited the number of awardees in a way that was inconsistent with Executive Order 13360 or OMB's "executive agent" designation.  In making this determination, GSA should address (1) the requirement in Executive Order 13360 that agencies "more effectively implement" Sections 644(g)(1) and 657f of Title 15, which set a government-wide goal of three percent for the participation in federal procurement contracts of service-disabled, veteran-owned small businesses and permitted agencies to establish certain set-aside and restricted-competition procurements for such

businesses, 69 Fed. Reg. at 62,549; 15 U.S.C. §§ 644(g)(1), 657f, and (2) the condition that OMB placed on its grant to GSA of the "executive agent" designation for the VETS GWAC: that GSA must select "the most highly qualified service-disabled veteran owned small businesses." AR 93 (Letter from Bolten to Perry, Encl. B (July 5, 2005)).

GSA shall proceed expeditiously, making the determinations noted *supra* within 120 days of the entry of this Opinion and Order.  *See* RCFC 52.2(a)(2)(B).  During the remand period, proceedings in this case shall be stayed.  *See* RCFC 52.2(a)(2)(C).  "The results of the proceedings on remand are subject to this court's review."  *Diversified Maint. Sys.,* 74 Fed. Cl. at 128 (quoting *Santiago v. United States*, 71 Fed. Cl. 220, 230 n.17 (2006)).

## CONCLUSION

For the reasons set forth, KCI's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART.  The government's cross-motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART.  KCI's bid protest is REMANDED to GSA for the agency to make a determination in accordance with this Opinion and Order.  GSA shall complete its determination within 120 days of the entry of this decision, and the decision on remand shall be filed with the Clerk as provided in RCFC 52.2(b)(3).  In the interim, further proceedings before this court are stayed.

KCI's motions for leave to supplement the administrative record are GRANTED IN PART and DENIED IN PART, as specified in this Opinion and Order.  The government's second motion for leave to supplement the administrative record is GRANTED.

On or before April 2, 2007, the parties are requested to submit proposed redactions of any confidential or proprietary information that may be set out in this decision as rendered under seal.

It is so ORDERED.


s/ Charles F. Lettow
Judge